# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Donald J. Trump for President, Inc.,   :
           Appellant         :
                              :
        v.                    :  No. 983 C.D. 2020
                              :  ARGUED:  October 20, 2020
Philadelphia County Board of    :
Elections; Commissioner Lisa M.  :
Deeley in her Official Capacity;   :
Commissioner Al Schmidt in his   :
Official Capacity; Commissioner   :
Omar Sabir in his Official Capacity  :


BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE ELLEN CEISLER, Judge
                HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION
BY JUDGE CEISLER                             FILED:  October 23, 2020

Donald J. Trump for President, Inc. (Campaign) appeals from the October 9, 2020 Order of the Court of Common Pleas of Philadelphia County (Trial Court), denying the Campaign's Emergency Election Petition (Petition).  In its Petition, the Campaign sought an order directing the Philadelphia County Board of Elections (Board) to permit representatives of the Campaign to enter and remain in the Board's satellite election offices as poll watchers pursuant to Sections 310(a) and 417(a) of the Pennsylvania Election Code (Election Code), Act of June 3, 1937, P.L. 1333, *as*

*amended*, 25 P.S. §§ 2650(a) and 2687(a).[1]  We affirm and adopt the Trial Court's Opinion and Order in full.

## Background

On October 1, 2020, the Campaign filed a Complaint in Equity against the Board and Commissioner Lisa M. Deeley, Commissioner Al Schmidt, and Commissioner Omar Sabir (together, Commissioners).  The Campaign is the principal committee for the reelection campaign of Donald J. Trump, the 45th President of the United States of America (President Trump).  President Trump is the Republican candidate for the office of the President of the United States of America in the upcoming November 3, 2020 General Election.  The Board is

---

[1] Section 310(a) of the Election Code provides:

> Any party or political body or body of citizens which now is, or hereafter may be, entitled to have watchers at any registration, primary or election, shall also be entitled to appoint watchers who are qualified electors of the county or attorneys to represent such party or political body or body of citizens at any public session or sessions of the county board of elections, and at any computation and canvassing of returns of any primary or election and recount of ballots or recanvass of voting machines under the provisions of this act.  Such watchers or attorneys may exercise the same rights as watchers at registration and polling places, but the number who may be present at any one time may be limited by the county board to not more than three for each party, political body or body of citizens.

25 P.S. § 2650(a).  Section 417(a) of the Election Code provides:

> Each candidate for nomination or election at any election shall be entitled to appoint two watchers for each election district in which such candidate is voted for.  Each political party and each political body which has nominated candidates in accordance with the provisions of this act, shall be entitled to appoint three watchers at any general, municipal or special election for each election district in which the candidates of such party or political body are to be voted for.  Such watchers shall serve without expense to the county.

25 P.S. § 2687(a).

2

responsible for elections in Philadelphia County. The Commissioners were elected by the citizens of Philadelphia County to four-year terms and are responsible for voter registration and elections in Philadelphia County.

On October 3, 2020, the Campaign filed its Petition in the Trial Court. On October 6, 2020, the Trial Court heard oral argument on the Petition and accepted documentary evidence into the record.

On October 9, 2020, the Trial Court issued its Order denying the Campaign's Petition. In its accompanying Opinion, the Trial Court analyzed the relevant provisions of the Election Code and concluded that the Board's satellite election offices are neither "polling places" nor "public sessions" under the Election Code and, thus, poll watchers are not permitted at those offices. That same day, the Campaign appealed to this Court.[2]

## Issues

The Campaign presents the following issues for this Court's review:

(1) Are the [s]atellite [e]lection [o]ffices opened and operated by the [Board] as of September 29, 2020, where voters register to vote, request a mail-in ballot in-person, receive it, and then vote by filling out their mail-in ballot and placing it in the possession of the [Board], all at the same location, "polling places" as defined by [Section 102(q) of] the Election Code[, ] 25 P.S. § 2602(q),[3] thus requiring [the Commissioners] to permit watchers to be present therein pursuant to [Section 417 of the Election Code,] 25 P.S. § 2687?

---

[2] This appeal involves statutory interpretation of the Election Code, which is a question of law; therefore, our standard of review is *de novo* and our scope of review is plenary. *Banfield v. Cortes*, 110 A.3d 155, 166 (Pa. 2015).

[3] Section 102(q) of the Election Code defines "polling place" as "the room provided in each election district for voting at a primary or election." 25 P.S. § 2602(q).

3

(2) Are the public spaces of the [s]atellite [e]lection [o]ffices operated by the [Board] and which opened to the public as of September 29, 2020, where voters register to vote, if needed, request a mail-in ballot in-person, receive it, and vote by filling out their mail-in ballot and placing it in the possession of the [Board], all at the same location, . . . "public sessions" of the Board . . . , therefore requiring [the Commissioners] to permit watchers or attorneys to be present therein pursuant to [Section 310 of the Election Code,] 25 P.S. § 2650?

Campaign Br. at 4.

## Analysis

On appeal, the Campaign contends that the Board's satellite election offices constitute either "polling places" or "public sessions" under the Election Code, thereby permitting poll watchers to be present at such offices. Specifically, the Campaign requests a declaration regarding its right to have poll watchers present at the satellite election offices pursuant to the Declaratory Judgments Act, 42 Pa. C.S. §§ 7531-41.

In ruling on the Campaign's Petition, the Trial Court engaged in a detailed analysis of the provisions of the Election Code. The Trial Court began by noting that the General Assembly did not expressly grant poll watchers access to the satellite election offices, as they are indisputably a new creation.[4] After discussing the statutorily enumerated rights of poll watchers under the Election Code, the Trial Court found that the "only questions that the Campaign . . . reasonably raise[d] . . . [were] whether the satellite offices qualify as 'polling places' . . . or as 'sessions of the county board of elections.'" Trial Ct. Op., 10/9/20, at 6.

The Trial Court first determined that satellite election offices are "not polling places . . . at which watchers have a right to be present under the Election Code."

---

[4] The Board opened its first satellite election offices in the City of Philadelphia on September 29, 2020.

4

*Id.* at 8. The Trial Court reasoned that the Election Code provides that polling places operate only on Election Day and are available only to voters residing in specific districts, whereas satellite offices are restricted by neither date nor location. *Id.* at 6-7. The Trial Court further explained that the Election Code specifically provides that mail-in ballots cannot be delivered to polling places, but must be sent to the Board's offices or placed in drop boxes. *Id.* at 8.

Next, the Trial Court determined that the Board's functions at the satellite election offices do not constitute "public sessions" under the Election Code. The Trial Court noted that the Election Code only contemplates "very limited" public sessions of the Board at which poll watchers are permitted to appear. *Id.* at 9. The Trial Court reasoned that the Board's "employees' functions at the satellite offices are not quasi-judicial; they are ministerial only." *Id.* at 10. The Trial Court explained that the Board's employees engage in the following ministerial acts: registering voters, processing applications for mail-in ballots, providing mail-in ballots to voters to complete in private, and receiving the "completed, sealed, mail-in ballots from voters." *Id.* at 10-11. Therefore, the Trial Court concluded that the General Assembly did not "cho[o]se to give watchers the right to be present in the offices of the Board . . . while the Board's employees are performing ministerial activities with respect to mail-in ballots prior to Election Day." *Id.* at 12.

After conducting a *de novo* review of the record, the parties' briefs and oral arguments before this Court, and the relevant law, we conclude that Judge Gary S. Glazer's Opinion thoroughly discusses, and correctly disposes of, the legal issues before this Court. Therefore, we adopt the analysis in Judge Glazer's Opinion in full for purposes of appellate review.

## **Conclusion**

Accordingly, we affirm the Trial Court's Order on the basis of Judge Glazer's Opinion filed on October 9, 2020, in *Donald J. Trump for President, Inc. v. Philadelphia County Board of Elections* (Philadelphia County, September Term 2020, No. 02035).

_____
ELLEN CEISLER, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | |
|---|---|
| Donald J. Trump for President, Inc.,    : <br> Appellant    : <br>    : <br> v.    :    No. 983 C.D. 2020 <br>    : <br> Philadelphia County Board of    : <br> Elections; Commissioner Lisa M.    : <br> Deeley in her Official Capacity;    : <br> Commissioner Al Schmidt in his    : <br> Official Capacity; Commissioner    : <br> Omar Sabir in his Official Capacity    : | |

# **O R D E R**

AND NOW, this 23rd day of October, 2020, the October 9, 2020 Order of the Court of Common Pleas of Philadelphia County is hereby AFFIRMED, and this Court hereby adopts the analysis in Judge Gary S. Glazer's Opinion in *Donald J. Trump for President, Inc. v. Philadelphia County Board of Elections* (C.P. Phil. Sept. Term 2020, No. 02035, filed on October 9, 2020), for purposes of appellate review.

_____

ELLEN CEISLER, Judge

0017_OPINION_FILED236_NOTICE_GIVEN

# IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
### TRIAL DIVISION – CIVIL

DONALD J. TRUMP FOR PRESIDENT, INC.,

        Plaintiff,

v.

PHILADELPHIA COUNTY BOARD OF ELECTIONS; COMMISSIONER LISA M. DEELEY IN HER OFFICIAL CAPACITY; COMMISSIONER AL SCHMIDT IN HIS OFFICIAL CAPACITY; COMMISSIONER OMAR SABIR IN HIS OFFICIAL CAPACITY

        Defendants.

SEPTEMBER TERM, 2020

NO. 02035

ELECTION MATTER

Control No. 20100256

## APPEAL OPINION

Plaintiff immediately appealed from this court's October 9, 2020, Order denying plaintiff's emergency Election Petition. In that Petition, plaintiff asked the court to order that defendants permit plaintiff's representatives to enter and remain in the Philadelphia County Board of Elections' satellite offices to serve as "watchers" pursuant to 25 Pa. Stat. Ann. §§ 2650 and 2687 of the Election Code of the Commonwealth of Pennsylvania.

For the reasons set forth in the court's Opinion filed in support of its Order, a copy of which is attached hereto, the court respectfully requests that its October 9th Order be affirmed on appeal.

**Dated: October 9, 2020**

GLAZER, J.

Donald J. Trump For President, Inc. Vs Phila-OPFLD



20090203500024

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

DONALD J. TRUMP FOR PRESIDENT, :     SEPTEMBER TERM, 2020
INC.,                             :
                                     :     NO. 02035

                     Plaintiff,    :
                                       :     ELECTION MATTER

                   v.              :
                                       :     Control No. 20100256

PHILADELPHIA COUNTY BOARD OF   :
ELECTIONS; COMMISSIONER LISA M. :
DEELEY IN HER OFFICIAL CAPACITY; :
COMMISSIONER AL SCHMIDT IN HIS   :
OFFICIAL CAPACITY; COMMISSIONER :
OMAR SABIR IN HIS OFFICIAL        :
CAPACITY                             :
                                       :
                  Defendants.   :

**OPINION**

On October 3, 2020, plaintiff, Donald J. Trump for President, Inc. (hereinafter, the "Campaign"), filed an emergency Petition in this Election Matter requesting that the court order defendants, the Philadelphia County Board of Elections, Commissioner Lisa M. Deeley, Commissioner Al Schmidt, and Commissioner Omar Sabir (collectively, the "Board of Elections") to "permit representatives of the Campaign to enter and remain in the satellite election offices to serve as a [sic] watchers pursuant to 25 Pa. Stat. Ann. §§ 2650 and 2687"[1] of the Election Code of the Commonwealth of Pennsylvania.[2]

---

[1] Plaintiff's Proposed Order, ¶ 3.

[2] 25 Pa. Stat. § 2600 *et seq.* "The laws relating to general, municipal, special and primary elections, the nomination of candidates, primary and election expenses and election contests [were first] codified, revised and consolidated" into the Election Code in 1937. *Id.* at § 2600.
    The Election Code has since been amended regularly, including recently by "Act 77 of 2019 which, *inter alia*, created for the first time in Pennsylvania the opportunity for all qualified electors to vote by mail, without requiring the electors to demonstrate their absence from the voting district on

The Board of Elections opened seven such satellite offices to great fanfare on September 29, 2020, and more may be opened at later dates prior to Election Day, which this year is November 3, 2020.[3] At these satellite offices, Board of Elections' employees register voters, receive voters' applications for mail-in ballots, provide mail-in ballots to voters, provide a private space for voters to fill in their mail-in ballots, and accept sealed mail-in ballots from voters, who may be residents of any ward or district in the County of Philadelphia, for later pre-canvassing and canvassing on Election Day.[4] The Campaign desires to appoint "watchers" to sit in these satellite offices to observe the employees and voters as they go about these activities in advance of Election Day.

"State law, not the Federal Constitution, grants individuals the ability to serve as poll watchers and parties and candidates the authority to select those individuals. . . . Because the Pennsylvania Election Code, not the United States Constitution, grants parties the ability to

---

Election Day." Pennsylvania Democratic Party v. Boockvar, 2020 WL 5554644, at *1, __ A3d __ (Pa. Sept. 17, 2020) (referencing 25 Pa. Stat. §§ 3150.11-3150.17).

[3] See 25 Pa. Stat. § 2751 ("The general election shall be held biennially on the Tuesday next following the first Monday of November in each even-numbered year. Electors of President and Vice-President of the United States, United States Senators, Representatives in Congress, the Governor, the Lieutenant Governor, the Secretary of Internal Affairs, the Auditor General, the State Treasurer and Senators and Representatives in the General Assembly shall be elected at the general election.")

[4] "The word 'pre-canvass' shall mean the inspection and opening of all envelopes containing official absentee ballots or mail-in ballots, the removal of such ballots from the envelopes and the counting, computing and tallying of the votes reflected on the ballots. The term does not include the recording or publishing of the votes reflected on the ballots." Id. at § 2602(q.1). "The county board of elections shall meet no earlier than seven o'clock A.M. on election day to pre-canvass all ballots received prior to the meeting." Id. at § 3146.8(g)(1.1).
"The word 'canvass' shall mean the gathering of ballots after the final pre-canvass meeting and the counting, computing and tallying of the votes reflected on the ballots." Id. at § 2602(a.1). "The county board of elections shall meet no earlier than the close of polls on the day of the election and no later than the third day following the election to begin canvassing absentee ballots and mail-in ballots not included in the pre-canvass meeting. The meeting under this paragraph shall continue until all absentee ballots and mail-in ballots received prior to the close of the polls have been canvassed." Id. at § 3146.8(g)(2).

2

appoint poll watchers, the state is free to regulate their use and its decision to do so does not implicate or impair any protected associational rights."[5]

Under the Pennsylvania Election Code, candidates, political parties, and political bodies, such as the Campaign here, are entitled to appoint watchers for each election district in an election.[6] The Election Code imposes one requirement for each watcher appointed by the Campaign, namely that s/he "must be a qualified registered elector of the county in which the election district for which the watcher was appointed is located."[7] If that requirement is met, then the county Board of Elections shall issue the watcher a certificate, "stating his name and the name of the candidate, party or political body he represents."[8] "Watchers may be required to show their certificates when requested to do so."[9]

---

[5] Republican Party of Pennsylvania v. Cortes, 218 F. Supp. 3d 396, 414 (E.D. Pa. 2016).

[6] See 25 Pa. Stat. § 2687(a). Watchers earn no more than $120.00 per day from a political body or other person, while "serv[ing] without expense to the county." Id. at § 2687(a), (c).

[7] Id. at § 2687(b). "[Q]ualified elector" shall mean any person who shall possess all of the qualifications for voting now or hereafter prescribed by the Constitution of this Commonwealth, or who, being otherwise qualified by continued residence in his election district, shall obtain such qualifications before the next ensuing election." Id. at § 2602.
The Election Code sometimes employs the term "elector" and sometimes uses the term "voter." For simplicity's sake, the court will use the term "voter" throughout this Opinion except where quoting directly from the Election Code.

[8] Id. at § 2687(b).

[9] Id. In this case, persons purporting to be watchers for the Campaign attempted to gain access to the Board of Elections' satellite offices when the offices first opened for business on September 29, 2020, but they were rebuffed. See Plaintiff's Petition, ¶¶ 33-35. However, the Campaign had not yet submitted an application to, nor received watchers' certificates from, the Board of Elections. See Plaintiff's Supplemental Memorandum of Law, Ex. H. Clearly, those individuals were not certified watchers at the time they attempted to gain access to the satellite offices.
For purposes of the remainder of this Opinion, the court will assume that the Campaign will be able to obtain certificates for at least some of the watchers for whom it submitted an application, i.e., that some of them will meet the statutory requirement to be a watcher, and the Board of Elections will perform its ministerial duty to provide each qualified person with a watcher's certificate in a timely fashion. See 25 Pa. Stat. §2642(e) ("The county boards of elections, within their respective counties, shall exercise, in the manner provided by this act, all powers granted to them by this act, and shall perform all the duties

3

The Election Code expressly grants such watchers the following substantive statutory rights:

1. To "be present in the polling place . . . from the time that the election officers meet prior to the opening of the polls under section 1208[10] until the time that the counting of votes is complete and the district register and voting check list is locked and sealed;"[11]

2. When "allowed in the polling place . . . [to] be permitted to keep a list of voters and [to] be entitled to challenge any person making application to vote and to require proof of his qualifications,"[12]

---

imposed upon them by this act, which shall include the following: . . .To issue certificates of appointment to watchers at primaries and elections.")

[10] 25 Pa. Stat. § 3048.

[11] *Id.* at § 2687(b). *See also id.* at § 3060(a) ("Until the polls are closed, no person shall be allowed in the polling place outside of the enclosed space at any primary or election, **except the watchers**, voters not exceeding ten at any one time who are awaiting their turn to vote, and peace officers, when necessary for the preservation of the peace.") (emphasis supplied).

[12] *Id.* at § 2687(b). The Election Code provides with respect to mail-in ballots that: " Not less than five days preceding the election, the chief clerk shall prepare a list for each election district showing the names and post office addresses of all voting residents thereof to whom official absentee or mail-in ballots shall have been issued. . . . He shall post the original of each such list in a conspicuous place in the office of the county election board and see that it is kept so posted until the close of the polls on election day. He shall cause the duplicate of each such list to be delivered to the judge of election in the election district in the same manner and at the same time as are provided in this act for the delivery of other election supplies, and it shall be the duty of such judge of election to post such duplicate list in a conspicuous place within the polling place of his district and see that it is kept so posted throughout the time that the polls are open. Upon written request, he shall furnish a copy of such list to any candidate or party county chairman." *Id.* at § 3146.2c(c). This provision enables the Campaign or its poll watchers, as well as the Judge of Election and other officials, to ascertain if any person who appears at a polling place on Election Day previously received a mail-in ballot, which would give the watchers, and others, grounds to challenge that person's right to vote at the polling place.

4

3. If certain conditions are met at the polling place, "to inspect the voting check list and either of the two numbered lists of voters maintained by the county board;"[13]

4. "[T]o represent [a] political body . . . at any public session or sessions of the county board of elections, and at any computation and canvassing of returns of any primary or election and recount of ballots or recanvass of voting machines;"[14]

5. "[A]t any recount of ballots or recanvass of voting machines, . . . to examine the ballots, or the voting machine and to raise any objections regarding the same, which shall be decided by the county board, subject to appeal;"[15]

6. To "be permitted to be present when the envelopes containing official absentee ballots and mail-in ballots are opened and when such ballots are counted and recorded."[16]

The very detailed Election Code contains no provision that expressly grants the Campaign and its representatives a right to serve as watchers at "satellite offices" of the Board of Elections, so the Campaign must shoehorn its argument into one of the six above enumerated rights of watchers.[17]

---

[13] 25 Pa. Stat. § 2687(b).

[14] *Id.* at § 2650(a).

[15] *Id.* at § 2650(c).

[16] *Id.* at § 3146.8(b).

[17] "Pennsylvania also does not permit poll watchers to monitor 'pre-canvass meetings,' although a 'representative' for each candidate and political party is permitted to attend" such pre-canvass meetings. Trump for President, Inc. v. Boockvar, No. 2:20-CV-966, 2020 WL 4920952, at *4 (W.D. Pa. Aug. 23, 2020) (citing the Campaign's Complaint in that action). *See* 25 Pa. Stat. § 3146.8(g)(1.1) ("One authorized representative of each candidate in an election and one representative from each political party shall be permitted to remain in the room in which the absentee ballots and mail-in ballots are pre-canvassed. No person observing, attending or participating in a pre-canvass meeting may disclose the results of any portion of any pre-canvass meeting prior to the close of the polls.")

The only activities occurring at the satellite offices are voter registration, application for mail-in ballots by individual voters, provision of mail-in ballots to individual voters, private completion of mail-in ballots by individual voters, and delivery by individual voters of their own mail-in ballots. No canvassing, re-canvassing, opening, counting, recounting, computation, or recording of ballots, votes, or voting machines is occurring at the satellite offices. Therefore, the rights bestowed upon watchers in Paragraphs 5 and 6 above, as well as the latter part of Paragraph 4, are not presently implicated here.[18] The only questions that the Campaign can and does reasonably raise here are whether the satellite offices qualify as "polling places" under Paragraphs 1, 2, and 3 above, or as "sessions of the county board of elections" under Paragraph 4 above.

In order to determine if satellite offices constitute "polling places" at which a watcher has a right to be present, one must scrutinize the Election Code's rather obtuse language for clues. Under the Election Code's definitions section, "[t]he words "polling place" shall mean the room provided in each election district for voting at a primary or election."[19] In the City of Philadelphia, "each ward . . . shall constitute a separate election district, unless divided into two or more election districts or formed into one election district, as hereinafter provided."[20] Since the Board of Elections' satellite offices serve the entire County and not just one election district or ward, they do not appear to be polling places as contemplated by the Election Code.

---

[18] If any of these acts do subsequently take place at the satellite offices, then watchers would be entitled to be present to the extent provided in the Election Code.

[19] 25 Pa. Stat. § 2602(q).

[20] *Id.* at § 2701.

6

Not only do the satellite offices fail to conform to the Election Code's geographic limits for polling places, satellite offices also fail to conform to the temporal limits for polling places, which encompass only a single Election Day: "At all primaries and elections the polls shall be opened at 7 A.M., Eastern Standard Time, and shall remain open continuously until 8 P.M., Eastern Standard Time, at which time they shall be closed."[21]

The portion of the Election Code that recognizes the right of watchers to be present in polling places similarly recognizes that polling places only exist on one Election Day. It gives watchers the right to watch

> from the time that the election officers meet prior to the opening of the polls under section 1208 until the time that the counting of votes is complete and the district register and voting check list is locked and sealed. . . . After the close of the polls and while the ballots are being counted or voting machine canvassed, all the watchers shall be permitted to be in the polling place outside the enclosed space. . . .Watchers allowed in the polling place under the provisions of this act, shall be permitted to keep a list of voters and shall be entitled to challenge any person making application to vote and to require proof of his qualifications, as provided by this act. During those intervals when voters are not present in the polling place either voting or waiting to vote, the judge of elections shall permit watchers, upon request, to inspect the voting check list and either of the two numbered lists of voters maintained by the county board: Provided, That the watcher shall not mark upon or alter these official election records. The judge of elections shall supervise or delegate the inspection of any requested documents.[22]

The referenced section, "1208," likewise recognizes the ephemeral existence of polling places:

> The judges, inspectors, clerks of election and machine inspectors, together with the overseers, if any, shall meet in the respective places appointed for holding the election in each election district at least thirty minutes before the hour for opening the polls **on the day of each primary and election.** They shall thereupon, in the presence of each other, take and subscribe in duplicate to the oaths required by this act. . . . If any judge of election shall not appear **at the polling place** by seven (7) o'clock A.M. **on the day of any primary or election,** the majority

---

[21] 25 Pa. Stat. § 3045.

[22] *Id.* at § 2687(b). This section lists several things that watchers may do, but they may not do them until they are allowed into a polling place on Election Day.

7

inspector shall appoint a judge of election, who is qualified under the provisions of this act. . . .[23]

Further support for the finding that a satellite office is not a polling place can be found in the provisions of the recently enacted Act 77 relating to mail-in ballots. For instance, a polling place is expressly not a place where mail-in ballots can be delivered by voters for the purposes of voting:

> [A] voter who applies for a mail-in ballot under section 1301-D[24] shall not be eligible to vote at a polling place on election day unless the elector brings the elector's mail-in ballot to the elector's polling place, remits the ballot and the envelope containing the declaration of the elector to the judge of elections to be spoiled and signs a statement subject to the penalties under 18 Pa.C.S. § 4904 (relating to unsworn falsification to authorities) to the same effect.[25]

> Any elector who receives and votes a mail-in ballot under section 1301-D shall not be eligible to vote at a polling place on election day. The district register at each polling place shall clearly identify electors who have received and voted mail-in ballots as ineligible to vote at the polling place, and district election officers shall not permit electors who voted a mail-in ballot to vote at the polling place.[26]

Given their scope, timing, and purpose, the satellite offices do not constitute polling places where watchers have a right to be present under the Election Code. The question then is whether they are "public sessions" of the Board of Elections at which watchers may be present as also provided in the Election Code:

> Any party or political body or body of citizens which now is, or hereafter may be, entitled to have watchers at any registration,[27] primary or election, shall also be

---

[23] 25 Pa. Stat. § 3048(a), (b) (emphasis supplied).

[24] *Id.* at § 3150.11.

[25] *Id.* at § 3150.12(f).

[26] *Id.* at § 3150.16(b)(1).

[27] Although the Election Code makes reference, rather misleadingly, to watchers at voter "registration," the section of the Election Code conferring the right of watchers to be present at voter registration places was repealed in 1995. *See* 25 Pa. Stat. Ch. 4A (Voter Registration Act [Repealed]).

entitled to appoint watchers who are qualified electors of the county or attorneys to represent such party or political body or body of citizens at any public session or sessions of the county board of elections, and at any computation and canvassing of returns of any primary or election and recount of ballots or recanvass of voting machines under the provisions of this act. Such watchers or attorneys may exercise the same rights as watchers at registration and polling places, but the number who may be present at any one time may be limited by the county board to not more than three for each party, political body or body of citizens.[28]

The Election Code contemplates very limited "public sessions" of the Board of Elections at which watchers are entitled to appear to represent their appointing authority, in this case the Campaign. The only other references to such public sessions in the Election Code are as follows:

> Each county board of elections may make regulations, not inconsistent with this act or the laws of this Commonwealth, to govern its **public sessions**, and may issue subpoenas, summon witnesses, compel production of books, papers, records and other evidence, and fix the time and place for **hearing any matters relating to the administration and conduct of primaries and elections in the county under the provisions of this act.** All subpoenas issued by the county board shall be in substantially the same form and shall have the same force and effect as subpoenas issued by the court of common pleas of such county, and, upon application, the board shall be entitled to the benefit of the process of such court if necessary to enforce any subpoena issued by them. Each member of the county board shall have the power to administer oaths and affirmations. Each person testifying before any county board shall be first duly sworn or affirmed.

> Any person filing any petition with a county board or opposing the same shall have the privilege of having subpoenas issued by the board to compel the attendance of witnesses, upon condition that all witnesses so subpoenaed shall be paid witness fees, in the manner herein provided.

> Witnesses subpoenaed by the county board shall each also be entitled to daily witness fees at the rate aforesaid, to be paid by the board: Provided, however, That election officers, clerks, machine inspectors, overseers and **watchers**, when subpoenaed by the county board to appear before the board, sitting for the

---

The Campaign is not attempting to appoint watchers for registration places, since that is no longer permitted under the Election Code.

[28] 25 Pa. Stat. § 2650(a).

computation and canvassing of votes cast at an election, shall not be entitled to witness fees.[29]

The county board of elections shall arrange for the computation and canvassing of the returns of votes cast at each primary and election at its office or at some other convenient public place at the county seat with adequate accommodations for the watchers and attorneys authorized by this act to be present, who shall be permitted to keep or check their own computation of the votes cast in the several election districts as the returns from the same are read, as hereinafter directed. The county board shall give at least one week's previous notice by newspaper publication, as provided by section 106[30] of this act, of the time and place when and where the board will commence and hold its **sessions for the computation and canvassing of the returns,** and keep copies of such advertisement posted in its office during said period.[31]

"The Election Code makes the County Board of Election more than a mere ministerial body. It clothes [the Board of Elections] with quasi-judicial functions" in certain instances where it hears disputed election matters and computes and canvasses returns.[32] However, the Board of Elections' employees' functions at the satellite offices are not quasi-judicial; they are ministerial only. Since the Board of Elections is not holding hearings nor canvassing returns at the satellite offices, the Board of Elections is not holding public sessions at those offices.

Since the satellite offices are not "polling places," nor do they constitute "public sessions" of the Board of Elections, the question is, what are they in the language of the Election Code? The answer lies in the activities that occur at such sites. At the satellite offices, Board of Elections' employees engage in the following ministerial acts: they register voters; they process voters' applications for mail-in ballots; they provide mail-in ballots to voters for the voters to

---

[29] 25 Pa. Stat. § 2644(a)-(c) (emphasis supplied).

[30] *Id.* at § 2606.

[31] *Id.* at § 3153(a) (emphasis supplied).

[32] Appeal of McCracken, 370 Pa. 562, 565, 88 A.2d 787, 788 (1952).

10

complete in private; and they receive completed, sealed, mail-in ballots from voters. All of these are activities that the Election Code contemplates taking place in an "office" of the Election Board:

> Applications may be submitted **to register to vote** or change party enrollment or name or address on a current registration record in person before the commission or a commissioner, a registrar or a clerk **at the office of the commission or at a place designated by the commission.**[33]

> Notwithstanding any other provisions of this act and notwithstanding the inclusion of a mailing address on an absentee or **mail-in ballot application,** a voter who presents the voter's own application for an absentee or mail-in ballot **within the office of the county board of elections** during regular business hours may request to receive the voter's absentee or **mail-in ballot** while the voter is at **the office.** This request may be made orally or in writing. Upon presentation of the application and the making of the request and upon approval under sections 1302.2 and 1302.2-D,[34] the county board of elections shall promptly present the voter with the voter's absentee or mail-in ballot. If a voter presents the **voter's application within the county board of elections' office** in accordance with this section, a county board of elections may not deny the voter's request to have the **ballot presented to the voter while the voter is at the office** unless there is a bona fide objection to the absentee or mail-in ballot application.[35]

> **Applications for mail-in ballots** shall be **received in the office of the county board of elections** not earlier than 50 days before the primary or election, except that if a county board of elections determines that it would be appropriate to the county board of elections' operational needs, any applications for mail-in ballots received more than 50 days before the primary or election may be processed before that time. Applications for mail-in ballots shall be processed if received not later than five o'clock P.M. of the first Tuesday prior to the day of any primary or election.[36]

> At any time after receiving an official **mail-in ballot,** but on or before eight o'clock P.M. the day of the primary or election, the mail-in elector shall, in secret, proceed to mark the ballot only in black lead pencil, indelible pencil or blue, black or blue-black ink, in fountain pen or ball point pen, and then fold the ballot, enclose and **securely seal** the same in the envelope on which is printed, stamped

---

[33] 25 Pa. Cons. Stat. § 1322 (Voter Registration Act) (emphasis supplied).

[34] 25 Pa. Stat. § 3150.12(b).

[35] *Id.* at § 3146.5(2)(b) (emphasis supplied).

[36] *Id.* at § 3150.12a(a) (emphasis supplied).

or endorsed "Official Election Ballot." This envelope shall then be placed in the second one, on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the local election district of the elector. The elector shall then fill out, date and sign the declaration printed on such envelope. Such envelope shall then be **securely sealed** and the elector shall send same by mail, postage prepaid, except where franked, or **deliver it in person to said county board of election.**[37]

The "**completed mail-in ballot** must be **received in the office of the county board of elections** no later than eight o'clock P.M. on the day of the primary or election."[38]

It is clear from a reading of the above sections that the satellite offices where these activities, and only these activities, occur are true "offices of the Board of Elections" and are not polling places, nor public sessions of the Board of Elections, at which watchers have a right to be present under the Election Code.

The Legislators who drafted the recently enacted Act 77, and the even more recent 2020 Amendments to the Election Code, which together encompass most of the mail-in ballot provisions cited above, were clearly aware of the existence of watchers, and even made express provision for them with respect to mail-in ballots: "Watchers shall be permitted to be present when the envelopes containing official absentee ballots and mail-in ballots are opened and when such ballots are counted and recorded."[39] However, neither those Legislators, nor any preceding drafters of the Election Code's provisions chose to give watchers the right to be present in the offices of the Board of Elections while the Board's employees are performing ministerial activities with respect to mail-in ballots prior to Election Day.[40] For this court to read into the

---

[37] 25 Pa. Stat. § 3150.16(a) (emphasis supplied).

[38] *Id.* at § 3150.16(c) (emphasis supplied).

[39] *Id.* at § 3146.8(b).

[40] In a related federal court action, the Campaign apparently admitted that "as it pertains to mail-in ballots, poll watchers are unable to monitor the drop off or mail in of ballots before Election Day."

12

Election Code the right of watchers to be present in Board of Elections' offices, which the Legislature did not expressly provide, would be the worst sort of judicial activism. This court will not engage in such improper conduct, which would be a clear usurpation of the legislative function.[41]

The Campaign has been invited by the Board of Elections to tour the satellite offices, but has not yet accepted that invitation. The court suggests that the Campaign do so. Furthermore, individuals who are residents of, or qualified voters registered in, Philadelphia County, and who are also associated with the Campaign, may enter the satellite offices to register to vote, apply for their own mail-in ballot, receive it, fill it out in private, and/or drop it off. However, they may not linger in the satellite offices indefinitely[42] as "watchers" under the Election Code.

---

Trump for President, Inc. v. Boockvar, 2020 WL 4920952, at *4 (W.D. Pa. Aug. 23, 2020) (citing plaintiff's own Complaint in that action).

[41] As our Supreme Court has previously held in a case involving similarly important matters of public interest, "[d]eciding the case as presented involves no "cover-up;" rather, the decision reflects fidelity to the command of the oaths [judges] take to support and defend the Constitution, and to exercise judicial restraint. The [Campaign's] approach, in contrast, is the opposite of strict construction and the height of judicial activism." In re Interbranch Comm'n on Juvenile Justice, 605 Pa. 224, 245, 988 A.2d 1269, 1282 (2010). "The public and political debate, of course, may encompass all voices, responsible and irresponsible, learned and reckless, and citizens in that debate are entitled to voice their opinions giving scant or no attention to salutary restrictions existing in the law, where foundational commands and precedent must hold sway. Our task is different from that of the litigant, the politician, or the editorialist, and it is inevitably less understood and often less popular. Our sworn task is to apply the law; and in so doing we cannot ignore, rewrite or torture settled language and propositions, and then apply that construct retroactively without affording the parties an opportunity to be heard, in order to reach a perceived favored conclusion, no matter how extreme the circumstance that brings a dispute to our attention." Id., 605 Pa. at 246, 988 A2d at 1283.

[42] Lingering indefinitely in indoor offices where many members of the public come and go is not recommended for health reasons in light of the COVID-19 pandemic that is ongoing at this time.

13

## CONCLUSION

For all the foregoing reasons, the Campaign's Petition for a court order directing the Board of Elections to permit representatives of the Campaign to enter and remain in the satellite election offices as watchers under the Elections Code is denied.

**BY THE COURT:**

GLAZER, J.

Donald J. Trump for President, Inc., :
                Appellant :
                               : No. 983 C.D. 2020
         v. :
                               : Argued: October 20, 2020
Philadelphia County Board of Elections; :
Commissioner Lisa M. Deeley in her :
Official Capacity; Commissioner Al :
Schmidt in his Official Capacity; :
Commissioner Omar Sabir in his :
Official Capacity :

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
               HONORABLE ELLEN CEISLER, Judge
               HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

## *OPINION NOT REPORTED*

DISSENTING OPINION
BY JUDGE McCULLOUGH                     FILED: October 23, 2020

       I respectfully, but most empathetically, dissent. In their rulings, the Court of Common Pleas of Philadelphia County (trial court) and a majority of this panel effectively deprive both presidential candidates, and by extension, every party and candidate, of their statutory right to have poll watchers present at places where electors cast and submit votes in person and in numbers unparalleled in our times.

       Underneath it all, there are three reoccurring themes in this matter: (1) the City of Philadelphia has received a monetary grant in excess of $10 million dollars, (Reproduced Record (R.R.) at 15a), from a private entity in Chicago to construct non-traditional, public polling places (so-called "Satellite Offices") where electors

are—and indeed have been—voting early and prior to Election Day; (2) our General Assembly included a provision in what is commonly referred to as "Act 77," and this section authorizes an elector to retrieve and complete a "mail-in" ballot and actually cast that ballot in person;[1] and (3) the issues surrounding "the ongoing COVID-19 pandemic," which our Supreme Court has recently said "equates to a natural disaster." *Pennsylvania Democratic Party v. Boockvar*, , __ A.3d __, __, 2020 Pa. LEXIS 4872, at *47, slip op. at 35, (Pa., 133 MM 2020, filed September 17, 2020). In essence, these three issues lie at the foundation of the decision of the trial court, which the majority adopts verbatim. But, if a natural disaster and the creation of new public forums in which to vote in person constitute a sufficient legal basis upon which to subvert the actual act of voting, and convert it into something that is allegedly not voting, while severely jeopardizing the integrity of our election procedures in the process, then I respectfully submit that we have gone too far.

At the outset, I note that this case has nothing to do with political division, racial, ethnic, or religious division, generational division, or some other divisive factor that (sadly) seems to be apparent in our current cultural landscape. This case, instead, has everything to do with something that every American citizen wants and desires—to protect the veracity and reliability of the fundamental right to vote and to ensure a fair election where everyone follows the same rules and is granted the same rights. After all, this is the hallmark feature that has separated our great Country from the rest of the world and has bestowed upon American citizens the most prolific form of government in the history of mankind. It seems no coincidence that this case originates in Philadelphia, the heart of William Penn's "Holy Experiment," which has once again become the epicenter for Penn's vision

---

[1] Act 77, *as amended by* section 17 of Act of March 27, 2020, P.L. 41, 25 P.S. §3150.16.

for unity, wisdom, and justice. As Penn stated in the preface to his "Frame of Government of Pennsylvania" in 1682, " . . . any government is free to the people under it . . . where the laws rule and the people are a party to those laws."[2]

In this regard, I believe that the Commonwealth of Pennsylvania has a special duty and obligation: "Like the constitutions of Virginia, New Jersey, Maryland, and most of the original 13 Colonies, Pennsylvania's Constitution was drafted in the midst of the American Revolution, as the first overt expression of independence from the British Crown." *Commonwealth v. Edmunds*, 586 A.2d 887, 896 (Pa. 1991). The right to vote emanates, in part, from the threat and fear of retaliation and persecution by the King, *see McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 342-43 (1995), and it is beyond cavil that the process and procedure for conducting a presidential election is largely left to the devices of the individual states. *See* Article II, section 1 of the United States Constitution, U. S. CONST. art. II, §1; *McPherson v. Blacker*, 146 U.S. 1, 28-35 (1892). It was here, in Pennsylvania, that the Declaration of Independence and the United States Constitution were drafted and adopted, ensuring protection of our sacred freedoms and rights and the recognition that "all men are created equal."

Notably, the Pennsylvania Constitution contains a Free and Equal Elections Clause, which provides that "Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." PA. CONST. art. I, §5. In interpreting the Pennsylvania Election Code in light of this constitutional provision, the Pennsylvania Supreme Court has long held that courts should construe the election laws liberally so "[t]echnicalities

---

[2] *See* https://www.legis.state.pa.us/cfdocs/legis/SpeakerBios/PAGovernment.cfm (last visited 10/22/20).

PAM – 3

should not be used to make the right of the voter insecure." *Appeal of James*, 105 A.2d 64, 65-66 (Pa. 1954). Our Supreme Court has also held that, in election matters, it "possesses broad authority to craft meaningful remedies when required." *League of Women Voters v. Commonwealth*, 178 A.3d 737, 822 (Pa. 2018). The circumstances surrounding this case, and the decision, will impact not only the appellant, Donald J. Trump for President, Inc. (Appellant), but every American's right of franchise – the right to vote.

To be sure, voters have a "right to cast a ballot in an election free from the taint of intimidation and fraud," *Burson v. Freeman*, 504 U.S. 191, 211 (1992), and "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (*per curiam*). In Pennsylvania, poll watchers play an important role in this respect and are permitted by statute to be present during the in-person voting process. *See* section 417(b) of the Election Code, 25 P.S. §2687(b). Specifically, the courts of Pennsylvania have recognized that poll watchers are permitted in polling places to monitor the course of voting, protest irregularities, *see Boockvar*, slip op. at 53, 2020 Pa. LEXIS 4872, at *74, and safeguard "the purity of the electoral process." *Tiryak v. Jordan*, 472 F. Supp. 822, 824 (E.D. Pa. 1979) (applying Pennsylvania law). As one commentator has noted, "[p]oll watchers ensure that poll workers are complying with the state election laws and that voters get to vote . . . thereby ensuring the integrity of the election process." James J. Woodruff II, <u>Where the Wild Things Are: The Polling Place, Voter Intimidation, and the First Amendment</u>, 50 U. LOUISVILLE L. REV. 253, 264 (2011) (footnotes omitted).

Put simply, under Pennsylvania law, poll watchers observe the electors as they vote at polling places. Section 102(q) of the Election Code defines a "polling

place" as "the room provided in each election district for voting at a primary or election."  25 P.S. §2606(q).  Here, there is an astounding amount of evidence (including photographic depictions, as seen below), admissions, and concessions (even an unopposed request for judicial notice) that conclusively establish that what is going on at these Satellite Offices is the actual, physical act of "voting."



TRIB LIVE   LOS ANGELES TIMES | Thursday, October 15, 2020 7:56 p.m.

AP

Philadelphia City Council President Darrell L. Clarke fills out his ballot at the opening of a satellite election office at Temple University's Liacouras Center on Sept. 29 in Philadelphia.

(Appellant's Request for Jud. Notice, Ex. 3.)  That is, at the Satellite Office itself, an elector is provided with a mail-in ballot, goes to a desk/table located where the voter is provided the "secrecy" required by the Election Code for all voters when they vote at a polling place, *see* 25 P.S. §§3146.6(a), 3150.16(a), manually

PAM – 5

completes and hands in an official ballot at a governmental place that accepts it, without any mail carrier, for that matter, as the official vote of that elector to be counted as part of the upcoming presidential election. *See, e.g.,* R.R. at 80a, 123a-28a. In point of fact, the fact that "voting" occurs at the Satellite Offices is not seriously disputed and, as such, it is not even worth repeating all of that in the record which supports the proposition. Nonetheless, there is nothing inherently sinister about this; indeed, it is sanctioned as a matter of statutory law. Under the Election Code, as amended by Act 77, "a voter who presents the voter's own application for [a] mail-in ballot within the office of the county board of elections during regular business hours may request to receive the . . . mail-in ballot while the voter is at the office . . . and upon approval . . . the county board of elections shall promptly present the voter with the voter's . . . mail-in ballot." Section 14 of Act 77, 25 P.S. §3146.5(b)(2). Another provision of the recently amended Election Code provides that, after the voter marks and secures the ballot in an inner secrecy envelope and a second envelope containing a declaration of the "Official Election Ballot," the voter may "*deliver it in person to said county board of election*." Section 17 of the Act of March 27, 2020, P.L. 41, No. 12, 25 P.S. §3150.16(a) (emphasis added).

So, the City of Philadelphia has created Satellite Offices purportedly pursuant to provisions of the Election Code which authorize an elector to go to "the county board of elections," obtain a mail-in ballot, complete it and place it in the proper enclosures, and cast the ballot as an official vote to the election officials—all right then and there, a "one stop shop" so to speak. Pursuant to this scheme, the elector, by any person's measure, tenders and submits a vote "in person" at a place and under conditions and circumstances that most certainly mimic a traditional polling place. Importantly, our General Assembly has permitted an elector to

PAM – 6

receive, complete, and submit an official mail-in ballot in person long before "Election Day" as that day appears on the calendar. By the accounts of their own representatives, the Satellite Offices have been open for in-person, mail-in voting since September 29, 2020, at the earliest.[3] To reiterate and reemphasize, our General Assembly has authorized poll watchers to be present at polling places where electors cast their votes in person.

That said, as a matter of legal principle, it is imperative that poll watchers be allowed to observe the electors when they attend the Satellite Offices to retrieve and submit their "mail-in votes" in person. This case is not about *whether* poll watchers should continue to be permitted at places where voting occurs, *i.e.*, polling places. Indeed, poll watchers have long been recognized by the General Assembly and the courts. They are statutory creatures, restricted to a limited number, and can only commence their duties after applying for and receiving certificates from the election board itself. A poll watcher, among other things, is "permitted to keep a list of voters," is "entitled to challenge any person making application to vote," and, in certain circumstances, can "inspect the voting check list." 25 P.S. §2687(b). Indeed, both political parties are in agreement that the normal poll-watching functions,

> include stationing individuals at polling stations to observe the voting process and report irregularities unrelated to voter fraud to duly-appointed state officials. Such observers may report any disturbance that they reasonably believe might deter eligible voters from casting their ballots, including malfunctioning voting

---

[3] *See* https://myvotemyway.philadelphiavotes.com/#_ga=2.145705084.910035695.16029 91680- (last visited 10/21/20). The Philadelphia County Board of Elections (Elections Board) has also unequivocally admitted that "Philadelphians began in-person mail-in voting at the [S]atellite [O]ffices on September 29, 2020, sometime between 11:30 a.m. and 12:45 p.m." (Response to Emergency Petition, ¶35, R.R. at 80a.) (emphasis added).

machines, long lines, or understaffing at polling places. Such observers may not question voters about their credentials; impede or delay voters by asking for identification, videotape, photograph, or otherwise make visual records of voters or their vehicles; or issue literature outlining the fact that voter fraud is a crime or detailing the penalties under any state or federal statute for impermissibly casting a ballot.

*Democratic National Committee v. Republican National Committee*, 671 F. Supp. 2d 575, 622-23 (D.N.J. 2009), *aff'd*, 673 F.3d 192 (3d Cir. 2012).

During argument, Appellant was asked what evidence its representatives had of any irregularities occurring at the Satellite Offices. The response given was as expected; since they were denied access to the Satellite Offices, they were denied the opportunity to observe what was occurring. When the Elections Board was asked why it did not want poll watchers present while these electors were voting, the response was "COVID." While I agree, and it is undisputable that protecting the health and welfare of the American people is a paramount concern, in this instance, the Election Board's assertion that it must therefore preclude the presence of a limited number of poll watchers who help to ensure the integrity of the election has a hollow ring. For example, the County of Philadelphia has regularly extended numerous invitations to the public encouraging electors to vote at the Satellite Offices, which has resulted in large numbers of electors visiting these sites daily. Moreover, the documents provided by Appellant show that some of these alleged "Board Offices" have been set up in large gymnasiums or rooms which provide ample opportunity for spacing and social distancing, including the wearing of masks. For reference, see the above-reproduced photograph of the President of Philadelphia's City Council at the "special *election* office." (Appellant's Request for Jud. Notice, Ex. 3.)

That voting irregularities can and do occur at voting sites during any election cannot be disputed. Hence, Appellant contends that being denied the opportunity to have poll watchers present now during the ongoing voting process prevents either party, and any candidate, from knowing whether and what irregularities are occurring, and from making a timely challenge thereto. The opportunity to observe these irregularities at the time of occurrence is essential, and can only be meaningful if it is done at the time of voting. For example, as in any election, whether intentional or inadvertent, it is very well possible that members or representatives of the Elections Board or others who have access to that office while electors are voting, could be exerting persuasive, or undue influence on the elector, implicit or explicit, for example, by informing the elector of the stance that a candidate has on a particular political issue when asked or affirmatively volunteering the candidate whom the board/staff member or other elector personally believes is the best choice. The Election Code clearly prohibits such interaction on Election Day while voting is occurring. Moreover, the distribution of all campaign material, access by candidates or their representatives, etc., are strictly regulated at polling places. The point being that campaigns cannot know that these rules are being followed unless or until there are poll watchers present to guard against such interference with the free will of an elector.

As another example, in *Boockvar*, our Supreme Court held that "ballots that voters have filled out incompletely or incorrectly" shall be set aside and declared void, and election boards are not required to afford these voters a "notice and opportunity to cure" procedure to remedy such defects. Slip op. at 41, 2020 Pa. LEXIS 4872 *55. The *Boockvar* Court further concluded "that a mail-in ballot that is not enclosed in the statutorily-mandated secrecy envelope ***must be disqualified***."

Slip op. at 53, 2020 Pa. LEXIS 4872 *73 (emphasis added). In this vein, a poll watcher is also necessary to ensure that the *Boockvar* mandates are carried out and not circumvented by the staff members of the Satellite Offices. In so stating, I do not suggest any impropriety on the part of the governmental officials and/or individuals connected to or working with the Elections Board at the Satellite Offices. Rather, I utilize these examples as illustrations to explain why the pinnacle of our Constitution—checks and balances against the abuse of power—is readily implicated in this case and with powerful force.

Against this backdrop, the trial court held that no "votes" are occurring at the Satellite Offices. (Trial court op. at 6.) In so doing, the trial court noted that the "Election Code contains no provisions that expressly grant Appellant and its representatives a right to serve as watchers at 'satellite offices.'" *Id.* at 5. From the legal issues presented, the trial court deduced that the pivotal question raised by Appellant was "whether the satellite offices qualify as 'polling places' . . . ." *Id.* at 6.

In answering the question in the negative, the trial court looked to section 102(q) of the Election Code, which, as previously mentioned, defines a "polling place" as "the room provided in each election district for voting at a primary or election." 25 P.S. §2602(q). In construing this phrase, the trial court first stated that in the City of Philadelphia, "each ward … shall constitute a separate election district, unless divided into two or more election districts or formed into one election district . . . ." (Trial court op. at 6.) Parsing the definition of a "polling place," the trial court then concluded that, because the Satellite Offices serve the entire County of Philadelphia, and not just one election district or ward, the Satellite Offices fail to conform to the Election Code's *geographic limits* for polling places. *Id.* In addition,

the trial court concluded that the Satellite Offices fail to comply with the *temporal* limits for polling places. Relying on section 1205 of the Election Code, 25 P.S. §3045 (Time for Opening and Closing Polls), the trial court determined that "polling places" exist only on one day, Election Day. (Trial court op. at 7) (citing 25 P.S. §3045 ("At all primaries and elections the polls shall be opened at 7 A.M. Eastern Standard Time, and shall remain open continuously until 8 P.M. Eastern Standard Time, at which time they shall be closed.")). Further, in the trial court's view, certain portions of section 417 of the Election Code, 25 P.S. §2687, which recognize the rights of poll watchers to be present at polling places, also establish that polling places exist only on "one Election Day." (Trial court op. at 7.) Ultimately, the trial court concluded that the Satellite Offices are not "polling places" based on its assessment that the Satellite Offices serve the entire County of Philadelphia, and not a single or individual election district, and because the Satellite Offices operate on days other than Election Day. For these two reasons, the trial court held that the Satellite Offices are not "polling places," as contemplated by the Election Code and, thus, Appellant has no right to have poll watchers present therein. (Trial court op. at 7.)

As a counter to the analysis proffered by the trial court, and adopted by the majority, I propose that, for the reasons stated above, the act of voting undoubtedly occurs when an elector completes and delivers a mail-in ballot in person "to said county board of election." 25 P.S. §3146.6(a). And, while the Election Code may split the County of Philadelphia into separate wards or districts, the statute authorizes counties to "provid[e] such branch offices for the [election] board in cities other than the county seat, as may be necessary." Section 305 of the Election Code, 25 P.S. §2645(b). Indeed, the Election Board argued that the Satellite Offices were

in fact "board offices" of the City Commission as contemplated under the Election Code. However, while these commissioners "may make regulations" to, *inter alia*, "[g]overn the public sessions of the commission," 25 Pa.C.S. §1203(f)(1), and create board offices to process and approve "applications from individuals who apply to be registered to vote," 25 P.S. §3071(a)[4], and "application[s] for an absentee or mail-in ballot," 25 P.S. §3146.5(b)(2), the Election Code expressly *does not include voting* as part of the commissioners' duties or activities that transpire at the board offices. Yet, the act of voting is precisely what is occurring at the Satellite Offices. The conduct of this voting activity, alone, would remove "Satellite Offices" from the ambit of "board offices" and the related duties of the commissioners with respect to "board offices." At the very least, the fact that voting happens at a Satellite Office renders it a polling place because it is "the room provided . . . for voting at a primary or election." 25 P.S. §2606(q).

Notably, the 15 or so Satellite Offices are situated throughout the various election districts in Philadelphia, and the County of Philadelphia is comprised solely of the City of Philadelphia. More importantly, by its own conduct, the Election Board arguably created "polling places," per the authority of section 526 of the Election Code, 25 P.S. §2726 (Polling places to be selected by county board). Without question, the COVID-19 pandemic is "an emergency or unavoidable event," 25 P.S. §2726(a), and the Election Board "publicly announce[d] . . . *a list of the places at which the election is to be held* in the various election districts of the county," 25 P.S. §2726(c) (emphasis added)—*i.e.*, the Satellite Offices.[5] Somewhat

---

[4] Section 1231 of the Election Code, added by Act of October 31, 2019, P.L. 552.

[5] For example, the Commissioners announced to the public on Twitter, "Make a plan *to vote*, either in person, by mail, or *at a satellite election office*." (R.R. at 123a) (emphasis added). **(Footnote continued on next page…)**

relatedly, section 528 of the Election Code states that "[i]f, in any election district, no proper polling place can be obtained, the county board of elections shall cause to be constructed for such district, *a temporary room of adequate size to be used as a polling place*." 25 P.S. §2728.[6] Consequently, any distinction that the trial court drew based upon "election districts" and geographic limitations for polling places appears to be a superficial and meaningless legal differentiation.

Moreover, with regard to considerations of temporality, I believe that a "polling place" is not denoted as such based on the date on which it is open for voting. Instead, I would follow the plain language definition of a "polling place" as being "*the room . . . for voting at a primary or election.*" 25 P.S. § 2602(q) (emphasis added). In short, this language strongly suggests that the paramount and dispositive trait of a "polling place" is that it is a location where an elector can go and cast his/her vote in person and in a private space, which, undisputedly, is what the Satellite Offices offer, allow, and do. *See* section 530 of the Election Code, 25

David Thornburgh, the President and CEO of the nonpartisan Committee of Seventy, declared on his Twitter: "*One stop shop voting* comes to PHL! A great option for voters." (R.R. at 125a.) (emphasis added). City Councilperson Darrell Clarke posted a picture to social media of a voter "casting her mail ballot all in one trip to the satellite election center." (R.R. at 126a.) For his part, Commissioner Al Schmidt informed the public that he "[a]pplied for, received, completed, and submitted my mail-in ballot at our one-stop-shop satellite election office at Roxborough High School." (R.R. at 125a.) On the previous day, Commissioner Schmidt stated, "The City Commissioners are opening temporary in-person mail-in voting satellite offices where registered voters can . . . complete their ballot, and return it, all in one visit." (R.R. at 128a.)

[6] In reviewing the language of section 528 of the Election Code, I perceive an analogy to First Amendment jurisprudence, which holds that when the government opens a non-traditional forum to the public, the government must provide the public with the same protections and rights that it is obligated to do so with a traditional, public forum. *See generally Cornelius v. NAACP Legal Defense and Education Fund, Inc.*, 473 U.S. 788 (1985); *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37 (1983). Imported here, this case law would suggest that "poll watchers" have an equal right to be present at traditional polling places and non-traditional ones, like the Satellite Offices.

P.S. §2730(a) ("The county board of elections shall cause all rooms used as polling places to be suitably provided with heat and light, and, in districts in which ballots are used, with a sufficient number of . . . booths with proper supplies, in which electors may conveniently mark their ballots, with a curtain, screen or door . . . so that in the marking thereof they may be screened from the observation of others."). The Election Code may have contemplated in-person voting on one day, Election Day in individual districts. That is traditional in-person voting as we know it. But, here, Act 77 allows for early voting which is occurring at the Satellite Offices. Therefore, the Majority's conclusion that polling places only exist on Election Day is contravened by Act 77 itself. Even more to the point, when considered as whole, the construct of Act 77, by altering the timeframe for voting and permitting mail-in ballots to be obtained, completed, and deposited prior to Election Day, arguably transformed or modified what a "polling place" is, irrespective of the time and date of the election. *See* 25 P.S. §3150.12(a) ("A qualified elector . . . may apply at any time before any primary or election for an official mail-in ballot in person or on any official county board of election form . . . ."). In fact, an elector can obtain a mail-in vote and hand deliver it at a Satellite Office on Election Day itself. *See* 25 P.S. §3150.16(a) ("At any time after receiving an official mail-in ballot, but on or before eight o'clock P.M. the day of the primary or election, the mail-in elector . . . shall send same by mail . . . or deliver it in person to said county board of election."). As such, I am unable to discern how or what manner Election Day, assuming it had any legal significance for purposes of determining what a "polling place" is, could retain such import given the amendatory provisions of Act 77. For all intents and purposes, and according to all public statements and announcements made by the County of Philadelphia, and local and national media, the presidential election is and has been

PAM – 14

happening since September 29, 2020. And all across America, news reports in Philadelphia and elsewhere have clearly conveyed that multi-millions of electors have already voted.

For the above-stated reasons, I would conclude that, at the very least, the Election Code, as amended by Act 77, evidences an ambiguity with respect to whether the Satellite Offices are polling places where poll watchers are authorized to oversee the electors' in-person voting of mail-in ballots. I would further conclude that this ambiguity, in order to protect the intent and spirit of the election process, and to preserve the goal of maintaining the integrity of such process, be resolved to recognize that the voting processes occurring at the Satellite Offices necessitate their recognition as "polling places." *See Appeal of James*, 105 A.2d at 65-66 (pronouncing that courts should construe election laws liberally so "[t]echnicalities should not be used to make the right of the voter insecure"). Accordingly, I would reverse the trial court's order and remand with direction that the trial court enter an order mandating that the Election Board permit Appellant, and by virtue thereof every candidate or party, to have statutorily recognized poll watchers present at all of its Satellite Offices, during all hours of operation, and to allow the poll watchers to remain in a position where they may reasonably observe what is occurring at the Satellite Offices, limited of course, by compliance with all reasonable safeguards implemented for health reasons.

With this being stated, I respectfully register my dissent.

_____
PATRICIA A. McCULLOUGH, Judge